**2021 UT App 115**

## THE UTAH COURT OF APPEALS

A1 PIONEER MOVING AND WCF MUTUAL INSURANCE COMPANY,
Petitioners,
*v.*
LABOR COMMISSION AND VILIAMI PULU,
Respondents.

Opinion
No. 20200534-CA
Filed November 4, 2021

Original Proceeding in this Court

Joshua M. Woodbury, Attorney for Petitioners

Tracy L. Olson and Chad P. Curtis, Attorneys for
Respondent Viliami Pulu

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES GREGORY K. ORME and DAVID N. MORTENSEN
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 A1 Pioneer Moving (A1) terminated Viliami Pulu's temporary total disability (TTD) benefits after he was fired for his involvement in a workplace altercation. The Utah Labor Commission (Commission) determined that Pulu was entitled to benefits. A1 and its insurer, WCF Mutual Insurance Company, seek review of the Commission's decision, and we decline to disturb it.

BACKGROUND

¶2 In July 2017, Pulu suffered an injury to his left shoulder while employed by A1. A1 subsequently provided Pulu with full-time, light-duty work.

¶3 On November 9, 2017, Pulu was involved in an altercation with a coworker (Coworker). He had asked Coworker to retrieve a key, but Coworker refused. Pulu responded by telling Coworker, "I'll kick your ass," to which Coworker responded, "[C]ome kick my ass." Pulu grabbed Coworker "by the neck in a one-hand chokehold and with the other hand threatened to punch him by raising his fist." Two other employees broke up the altercation.

¶4 A1 had in place "a written workplace health and safety rule that prohibit[ed] all threats of (or actual) violence," the violation of which would "result in disciplinary action up to and including termination of employment." A1 terminated Pulu on November 12, 2017.

¶5 After Pulu's termination, A1 did not provide TTD benefits to Pulu from November 12, 2017, to December 12, 2017. However, A1 did provide TTD benefits from December 13, 2017, (the date of the surgery on Pulu's shoulder) to December 21, 2017. From December 22, 2017, forward, A1 provided Pulu no TTD benefits. A1 never applied for a hearing with the Commission seeking a reduction or termination of Pulu's TTD benefits.

¶6 Pulu filed an Application for Hearing in March 2019, claiming entitlement to TTD benefits from November 12, 2017, to December 12, 2017, and from December 22, 2017, to August 9, 2018. In its disclosures, A1 identified its defense to the discontinuation of benefits: "[Pulu] is not entitled to further disability compensation pursuant to Utah Code § 34A-2-410.5(2)(a)[1] on the basis that [Pulu's] employment . . .

---

1. This section of the code states,

> In accordance with this section, the commission
> may reduce or terminate an employee's disability

(continued…)

[termination] was reasonable, for cause, and as a result of violent and threatening conduct which was also a violation of reasonable workplace policies."

¶7 After the hearing, the administrative law judge (ALJ) issued findings of fact and conclusions of law. The ALJ determined that Pulu was entitled to TTD benefits for the two disputed periods but, reasoning that Pulu's "conduct and termination [was] analogous to an employee who engages in willful misconduct," ordered that his compensation be reduced by 15%. *See* Utah Code Ann. § 34A-2-302(3)(a) (LexisNexis Supp. 2021) (stating that workers' compensation benefits "shall be reduced 15% when injury is caused by the willful failure of the employee" to follow safety rules). The ALJ explained that the reduction was justified because Pulu's misconduct "was [relatively] minor with no injuries to either employee, and other similar physical altercations and threats had gone undisciplined by A1 Pioneer."

---

(…continued)

> compensation for a disability claim for good cause shown by the employer including if:
> (a) the employer terminates the employee from the reemployment and the termination is:
> > (i) reasonable;
> > (ii) for cause; and
> > (iii) as a result, in whole or in part, of:
> > > (A) criminal conduct;
> > > (B) violent conduct; or
> > > (C) a violation of a reasonable, written workplace health, safety, licensure, or nondiscrimination rule that is applied in a manner that is reasonable and nondiscriminatory . . . .

Utah Code Ann. § 34A-2-410.5(2) (LexisNexis Supp. 2021).

¶8      Both Pulu and A1 sought review of the ALJ's decision. While Utah Code section 34A-2-410(2)[2] provides that TTD benefits must be paid when an employer is unable to make available authorized light-duty employment, A1 argued that "[c]onversely, where suitable light duty work is made available, refusal to do that work by the employee provides a defense to compensation benefits." Accordingly, A1 asserted that Pulu was not entitled to any benefits because he "constructively refused available light duty work by engaging in threats of violence and actual violence against a coworker." *See Stampin' Up, Inc. v. Labor Comm'n*, 2011 UT App 147, ¶¶ 8–10, 256 P.3d 250 (acknowledging that an "employee's deliberate, volitional conduct with the intent to sever an employment relationship" can be construed as a constructive refusal of available light-duty work).

¶9      In his motion for review of the decision, Pulu argued that the ALJ erred in reducing his compensation by 15% because A1 failed to comply with Utah Code section 34A-2-410.5's procedural requirements and limitations period. *See* Utah Code Ann. § 34A-2-410.5(4)(a) (LexisNexis Supp. 2021) (stating that an employer seeking reduction or termination of disability compensation after an employee's good-cause termination or incarceration "may file an application for a hearing" with the Commission's Division of Adjudication).

¶10     The Commission rejected A1's constructive-refusal argument because "A1's position necessarily assign[ed] motives to . . . Pulu for which there [was] no evidence" and there was

---

2. "If a light duty medical release is obtained before the employee reaches a fixed state of recovery and no light duty employment is available to the employee from the employer, temporary disability benefits shall continue to be paid." Utah Code Ann. § 34A-2-410(2) (LexisNexis 2019).

"nothing in the record to indicate that . . . Pulu engaged in the fight with [Coworker] in order to purposely sever his employment relationship with A1." Regarding the 15% reduction, the Commission stated,

> Because . . . Pulu's entitlement to temporary disability benefits had been established, the proper way for A1 to seek reduction or termination of those benefits was to file an application for hearing as provided for in § 410.5(4). Instead, A1 denied paying temporary total disability compensation to . . . Pulu and then sought to justify it after the fact based on his termination for cause. The foregoing statute and rule[3] do not provide for such an approach.

Accordingly, the Commission modified the ALJ's decision by determining that Pulu was entitled to benefits for the two time periods without any reduction. A1 seeks review of the Commission's order.

## ISSUES AND STANDARDS OF REVIEW

¶11 A1 seeks judicial review and presents two issues for our consideration. A1 first asks whether the Commission erred in interpreting Utah Code section 34A-2-410.5 as requiring A1 to follow the procedures set forth in that statute prior to

---

3. "An employer shall not terminate or reduce an employee's temporary disability compensation pursuant to section 34A-2-410.5 prior to issuance of a final order by the Commission ordering the reduction or termination." Utah Admin. Code R602-4-2.

terminating Pulu's TTD benefits.[4] "We review statutory interpretations by agencies for correctness, giving no deference to the agency's interpretation." *Cook v. Department of Com.*, 2015 UT App 64, ¶ 12, 347 P.3d 5 (quotation simplified).

¶12    A1 next asks us to consider whether the Commission erred when it concluded that Pulu did not constructively refuse light-duty work as a result of his participation in the physical altercation.[5] This issue presents a question of fact, and "when the Labor Commission's factual determinations are properly before us on review, we review them under the substantial evidence

---

4. A1 formulates this as two issues: (1) "Did the Labor Commission err when it rejected the argument that [Pulu] forfeited entitlement to TTD compensation for violating [A1's] workplace rule against threatening or engaging in violent behavior in the workplace?" and (2) "Did the Labor Commission err by concluding that [A1 was] required to file an application for hearing under Utah Code § 34A-2-410.5(4)?" A1's formulation represents two facets of the same issue, so we have chosen to analyze this as a single issue. *See Carter v. State*, 2012 UT 69, ¶ 16 n.7, 289 P.3d 542 ("It is a maxim of appellate review that the nature and extent of an opinion rendered by an appellate court is largely discretionary with that court." (quotation simplified)).

5. A1 formulates this as three issues: (1) "Did the Labor Commission err in finding that [Pulu's] actions did not constitute a constructive intent to sever his employment relationship?" (2) "Did the Labor Commission err in finding that [Pulu's] actions did not constitute a constructive refusal of light-duty work?" and (3) "Did the Labor Commission err in applying the standard" found in *Stampin' Up, Inc. v. Labor Commission*, 2011 UT App 147, 256 P.3d 250? For the same reason expressed above, *see supra* note 4, we have consolidated these issues.

standard of review, examining the whole record to determine whether a reasonable mind might accept as adequate the evidence supporting the decision." *Quast v. Utah Labor Comm'n*, 2017 UT 40, ¶ 15, 424 P.3d 15 (quotation simplified).[6] "A decision is supported by substantial evidence if there is a quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Provo City v. Utah Labor Comm'n*, 2015 UT 32, ¶ 8, 345 P.3d 1242 (quotation simplified).

---

6. Pulu argues that A1 did not preserve this second issue because the constructive-refusal argument was not raised as an affirmative defense before the ALJ but only during the hearing before the Commission. We are not persuaded that this issue is unpreserved. "In an administrative proceeding, the preservation doctrine requires the challenged issue to initially be brought to the fact finder's attention so that there is at least the possibility that it could be considered." *Columbia HCA v. Labor Comm'n*, 2011 UT App 210, ¶ 6, 258 P.3d 640 (quotation simplified). Because "both the ALJ and the Commission have fact-finding authority," A1 was required "to have raised the issues currently on appeal to either the ALJ or the reviewing Commission for the issues to be properly preserved." *See id.* This issue was raised before the Commission, so we conclude that this issue was properly preserved in this context because the Commission was able to adjudicate the issue. *See id.* ("[The employer] satisfied the preservation requirement by raising the issue at the administrative level so either the administrative law judge or the Commission could have adjudicated the issue." (quotation simplified)); *see also Pease v. Industrial Comm'n*, 694 P.2d 613, 616 (Utah 1984) ("Had [the employer] raised the issue, either the administrative law judge or the Commission could have adjudicated the issue . . . .").

ANALYSIS

I. Utah Code Section 34A-2-410.5's Procedural Requirements

¶13   Subsection (2) of Utah Code section 34A-2-410.5 grants the Commission the authority to "reduce or terminate an employee's disability compensation for a disability claim" if an "employer terminates the employee from the reemployment[7] and the termination is . . . reasonable," "for cause," and the result of "violent conduct" or a "violation of a reasonable, written workplace . . . safety . . . rule." Utah Code Ann. § 34A-2-410.5(2) (LexisNexis Supp. 2021).

¶14   Subsection (4) of the same statute instructs an employer or insurer seeking such a reduction or termination of benefits to apply for a hearing with the Commission's Division of Adjudication. *See id.* § 34A-2-410.5(4)(a) ("An employer or the employer's insurance carrier may file an application for a hearing with the Division of Adjudication to request that an employee's disability compensation for a disability claim be reduced or terminated under this section."). The limitations period for filing this application for a hearing is one year from the date of termination. *Id.* § 34A-2-410.5(4)(b). If after a hearing the Commission determines that the conditions of subsection (2) are met, the Commission "may reduce or terminate the disability compensation." *See id.* § 34A-2-410.5(5)(a).

¶15   Subsection (7) of the statute allows the Commission to "make rules . . . related to the procedures for a request for a hearing" to reduce or terminate disability benefits. *See id.* § 34A-

_____

7. "'Reemployment' means employment that: (i) is after an accident or occupational disease that is the basis for a disability claim; and (ii) . . . offers to an employee an opportunity for earnings . . . ." Utah Code Ann. § 34A-2-410.5(1)(e).

2-410.5(7). Acting on this authorization, the Commission has put in place the following administrative rule: "An employer shall not terminate or reduce an employee's temporary disability compensation pursuant to section 34A-2-410.5 prior to issuance of a final order by the Commission ordering the reduction or termination." Utah Admin. Code R602-4-2.

¶16 A1 argues that contrary to the plain language of subsection (4) and the accompanying administrative rule R602-4-2, employers are not required to file an application for a hearing to seek reduction or termination of benefits under the conditions described in subsection (2). A1 asserts,

> Utah Code authorizes the Labor Commission to reduce or terminate benefits under § 34A-2-410.5 regardless of whether an employer or the employer's insurance carrier files an application for hearing. If such an application is filed, a reduction or termination would be governed by § 34A-2-410.5(5). If no application is filed, and good cause is shown, a reduction or termination of benefits would fall under § 34A-2-410.5(2).

Thus, A1's assertion is that filing an application is essentially discretionary and not mandatory—an employer seeking to reduce or terminate benefits could pursue a unilateral path under subsection (2) or the application path under subsection (4). This reading is unpersuasive for several reasons. First, on a practical level, no employer would submit an application to the Division of Adjudication under A1's reading, opting instead for a unilateral route absent the Commission's involvement. A1 makes no attempt to explain why the legislature would put in place a procedure that is merely optional for employers seeking relief from paying benefits to a terminated employee. As Pulu points out in his brief, A1's interpretation would make the statute's procedures and limitations period applicable only "to

those employers/insurers that were foolish enough to seek the Commission's permission and provide the employee with due process."

¶17    Second, A1's reading renders the majority of the statute superfluous. While subsection (2) states that the *Commission* may reduce or terminate disability benefits if an employee is terminated for cause involving violent conduct or a violation of written workplace safety rules, there is no mechanism in the statue for involving the Commission without notification by the employer. The obvious question under A1's interpretation of the statute involves how the Commission would become involved in any sort of reduction of benefits absent some type of application by the employer. The answer is that the Commission does not take any action to reduce or terminate benefits without an employer's application. And the procedures for submitting an application are covered in the following subsections of the statute. *See* Utah Code Ann. § 34A-2-410.5(4)(a) ("An employer or the employer's insurance carrier may file an application for a hearing with the Division of Adjudication to request that an employee's disability compensation for a disability claim be reduced or terminated under this section."); *id.* § 34A-2-410.5(5)(a) ("The commission may reduce or terminate the disability compensation of an employee for a disability claim if after a hearing requested under Subsection (4), the commission determines that the conditions of Subsection (2) are met."); *id.* § 34A-2-410.5(7) ("[T]he commission may make rules: (a) describing factors to be considered under Subsection (2); and (b) related to the procedures for a request for a hearing under this section."). Thus, subsection (2) does not stand alone as a path for the unilateral reduction or termination of the benefits an employer is obligated to pay an employee. Rather, the particular subsection is an umbrella provision that sets the conditions (namely, termination for violent behavior, incarceration, and drug/alcohol impairment) under which benefits may be

terminated through the process described in subsections (4) through (7).

¶18    Moreover, the use of the word "may" in subsection (4) should not be construed to imply that filing an application with the Commission is optional for an employer seeking reduction or termination of benefits under the conditions described in subsection (2). Rather, the subsection's use of "may" indicates that an employer retains the discretion to determine whether to file an application to seek reduction or termination of an employee's benefits. But if an employer does wish to avail itself of the process by which the Commission might reduce or terminate benefits, based on the relevant provisions, it must file an appropriate application and follow the process outlined in the statute. Thus, while an employer is under no obligation to seek reduction or termination of benefits under the conditions described in subsection (2), if that employer wishes to seek reduction or termination, filing the application and following the procedure are required for the Commission to entertain the request. *See* Utah Admin. Code R602-4-2 ("An employer shall not terminate or reduce an employee's temporary disability compensation pursuant to section 34A-2-410.5 prior to issuance of a final order by the Commission ordering the reduction or termination."). In other words, the only way to reduce or terminate benefits under subsection (2) is by way of an order from the Commission, and the only way that such an order gets issued is by an employer first filing an appropriate application with the Commission.

¶19    Regarding the applicability of section 34A-2-410.5, A1 also argues that "[t]his case does not deal with the termination or reduction of compensation benefits which were being paid to" Pulu because "Pulu was not receiving any indemnity compensation benefits at the time of his termination that could be reduced or terminated." But this argument is at odds with the record. For the month immediately after Pulu was terminated on

November 12, Pulu received no pay whatsoever. But he started receiving TTD benefits during the week after his surgery on December 13. So while it is true that Pulu was not receiving TTD benefits at the time he was fired—indeed he could not have been receiving them because he had been employed and assigned light-duty work by A1—he was receiving TTD benefits when A1 unilaterally terminated those benefits on December 21. Moreover, as the Commission pointed out, Pulu's right to TTD benefits vested at the time of his injury. *See King v. Industrial Comm'n*, 850 P.2d 1281, 1293 (Utah Ct. App. 1993) ("[T]he Utah Workers' Compensation Act is based on contract principles and an employee's right to benefits arises when [the employee] suffers a work-related injury."), *abrogated on other grounds by Murray v. Utah Labor Comm'n*, 2013 UT 38, 308 P.3d 461.

¶20    The Commission did not err in concluding that A1 was required to file an application pursuant to Utah Code section 34A-2-410.5(4) before it could reduce or terminate the benefits that Pulu was entitled to after his termination.

## II. Constructive Refusal of Light-Duty Work

¶21    A1 next argues that "Pulu's actions leading to his termination were not only intentional and deliberate, but also demonstrated intent to sever his employment relationship." Thus, A1 asserts that Pulu constructively refused the light-duty work that A1 had made available to him and, accordingly, A1 was under no obligation to provide statutorily mandated temporary disability benefits. *See* Utah Code Ann. § 34A-2-410 (LexisNexis 2019) ("If a light duty medical release is obtained before the employee reaches a fixed state of recovery and no light duty employment is available to the employee from the employer, temporary disability benefits shall continue to be paid.").

¶22    Key to the resolution of this issue is the application of this court's decision in *Stampin' Up, Inc. v. Labor Commission*, 2011 UT App 147, 256 P.3d 250. Pulu argues that *Stampin' Up* is directly on point and resolves the issue of whether he constructively refused light-duty work when he engaged in the altercation. To the contrary, A1 asserts that Pulu's actions are "highly distinguishable" from those at issue in *Stampin' Up*, making *Stampin' Up* largely inapplicable here. We agree with Pulu.

¶23    In *Stampin' Up*, an employee injured his shoulder, received TTD benefits for about a week, and was placed on light-duty work following release from his treating doctor. *Id.* ¶ 2. He continued to perform the light-duty work until he was terminated a few months later for sending pornographic images to other employees via cell phone and on company email accounts. *Id.* After the employee's termination, the employer's insurance did not resume paying TTD benefits, asserting that the employee, through "bad acts resulting in the termination," had "constructively rejected" the light-duty work the employer had made available. *Id.* (quotation simplified). After a hearing on whether the employee was entitled to benefits after his termination, the ALJ rejected the employer's argument, concluding that the employee "did not intentionally engage in misconduct with the purpose of severing the employment relationship; therefore, he was entitled to temporary disability benefits." *Id.* ¶ 5. The Commission subsequently affirmed the ALJ's decision. *Id.* ¶ 6.

¶24    On review, this court allowed the decision to stand, reasoning that the "Commission's interpretation of [Utah Code section 34A-2-410(2)] reasonably draws a line between deliberate conduct by which an employee intends to sever his or her employment relationship and conduct that, while perhaps deliberate, lacks that purpose." *Id.* ¶ 11. This court explained that just because an employee is terminated for good cause, it does not necessarily follow that the employee constructively rejected

available light-duty work. *See id.* ¶ 10. Rather, this court agreed with the Commission that constructive refusal of light-duty work requires a showing "that the terminated employee acted deliberately and with the intent to sever [the employment] relationship with [the] employer." *Id.* ¶ 9.

¶25 A1 argues that Pulu's bad conduct differed from that in *Stampin' Up* in two crucial ways. First, A1 asserts that "the severity of the conduct here is much more pronounced than the conduct at issue in *Stampin' Up*" because it involved "potential life-threatening injuries" and "physical harm to a co-worker." Second, A1 points out that Pulu's conduct was in "direct violation" of A1's written policies. A1 argues that these two factors demonstrate that "Pulu's conduct was carried out with the intent to sever the employment relationship." A1 goes on: "Some acts are so brutal and outside the scope of acceptable workplace conduct that they must be deemed indicative of an intent to sever the employment relationship."

¶26 We disagree with A1 that Pulu's conduct demonstrated an intent to sever his employment. As the Commission pointed out in its order modifying the ALJ's decision, "There is nothing in the record to indicate . . . Pulu engaged in the fight with [Coworker] in order to purposely sever his employment relationship with A1." Indeed, the record indicates that Pulu had no intention of severing his employment relationship. While the policy on workplace violence had been in place since 2006, the Commission determined that no employee had ever been terminated for engaging in workplace violence prior to Pulu; in fact, Coworker himself had been involved in a previous physical altercation in the workplace with a different coworker and had not been fired. Moreover, the record from the hearing indicates that the written policy may have never been distributed to A1's employees. Thus, if no employee had been terminated for engaging in workplace violence and Pulu appears not to have received the written policy about the consequences of workplace

violence, it seems unlikely that he intended to sever his employment relationship by engaging in an altercation with Coworker. Given these circumstances, even if Pulu knew that he *could* get fired for fighting with a coworker, it is doubtful that he thought he *would* get fired for his actions—and it is even more implausible that he engaged in the violent conduct with the *intent* to get fired.

¶27 And contrary to A1's characterization, the altercation does not appear to have been severe. Indeed, the ALJ described the violent conduct as "[relatively] minor with no injuries to either employee." And Pulu and Coworker both testified that comments such as "I'll kick your ass" were common in the workplace and were more akin to playful banter than actual threats of violence. Thus, the context of the working relationship between Pulu and Coworker does not suggest that their interaction on the day of the altercation indicated that Pulu acted with the intent to sever his employment relationship.

¶28 A1's contention that Pulu constructively refused to accept light-duty work does not add up. This case is more similar to *Stampin' Up* than different. Because Pulu did not "act[] deliberately and with the intent to sever" his employment relationship, A1's assertion that Pulu constructively refused light-duty work fails. *See Stampin' Up*, 2011 UT App 147, ¶ 9.

CONCLUSION

¶29 The Commission did not err when it determined that A1 was required to apply for a termination of Pulu's benefits instead of terminating them unilaterally. And we uphold the Commission's determination that Pulu's violent behavior did not constitute a constructive refusal of available light-duty work. Accordingly, we decline to disturb the Commission's decision.

————————