2026 UT App 67

## THE UTAH COURT OF APPEALS

DUSTIN SIDWELL, MARIE SHELTON, AND BRIAN MYERS,
Appellants,
*v.*
WASATCH COUNTY, WASATCH COUNTY BOARD OF ADJUSTMENT,
AND WASATCH COUNTY PLANNING COMMISSION,
Appellees.

ULA, LLC,
Intervenor-Appellee.

Opinion
No. 20240911-CA
Filed April 30, 2026

Fourth District Court, Heber Department
The Honorable Jennifer A. Mabey
No. 230500107

J. Craig Smith, Clayton H. Preece, and
Jay L. Springer, Attorneys for Appellants

Scott H. Sweat and Alex D. Stoedter,
Attorneys for Appellees

David L. Mortensen, Melanie R. Clark, and
Elise M. Carter, Attorneys for Intervenor-Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and JOHN D. LUTHY concurred.

HARRIS, Judge:

¶1    ULA, LLC—an entity doing business as Cascade Academy
(Cascade)—wants to operate Cascade House, which it describes
as a residential treatment facility designed for up to eight teenage
girls living with various mental health disorders. What's notable
here is *where* Cascade wants to operate Cascade House: in
Wasatch County, on property located inside the residential-

agricultural (RA-1) zone. Under the Wasatch County Code (WCC), land use within the RA-1 zone is restricted, but "residential facilit[ies]" for "persons with disabilities" may be conditionally permitted.

¶2 Cascade submitted an application for a conditional use permit to operate Cascade House within the RA-1 zone, and that application was approved—over objection from Dustin Sidwell, Marie Shelton, and Brian Myers (collectively, Appellants)—first by the Wasatch County Planning Commission (the Planning Commission) and then by the Wasatch County Board of Adjustment (the Board). Appellants petitioned for judicial review of the Board's decision in the district court. There, both sides filed cross-motions for summary disposition, and after briefing and oral argument, the court dismissed Appellants' petition, upholding the Board's determination that Cascade House meets the WCC's conditional use requirements regarding residential facilities for persons with disabilities in the RA-1 zone.

¶3 Appellants now appeal that decision, arguing that Cascade House does not meet the pertinent requirements of the WCC. In particular, and among other things, Appellants point out that the WCC requires Cascade House—in order to be allowed to operate inside the RA-1 zone as a residential facility for persons with disabilities—to "[b]e operated by or operated under contract with" the Utah Department of Health and Human Services, and they assert that Cascade House does not meet this requirement. On this point, we agree with Appellants, and on that basis we reverse the order dismissing Appellants' petition and remand this case to the district court for entry of an order granting the petition.

BACKGROUND

¶4 Cascade wishes to "open a small 8-bed residential treatment center" known as Cascade House that will house up to eight unrelated "girls between the ages of 13–18 with severe

anxiety disorders with specialized treatment for Obsessive-Compulsive Disorder." The "average length of stay" is expected to be "45–90 days with 24-hour supervision." As Cascade describes it, the goal of Cascade House "is to create a transitional environment for residents receiving care that will fit in with a residential neighborhood."

¶5     Cascade proposes that Cascade House be located on property in Wasatch County that is within the RA-1 zone. The purpose of this particular zone is to "allow[] residential development near the incorporated areas, while maintaining the rural atmosphere of Wasatch County." WCC § 16.08.01(A). "The intent of the zone is to increase lot sizes as development moves away from incorporated areas as a means of facilitating a transitional development area and to maintain, as much as possible, the rural character of the [c]ounty." *Id.* Inside this zone, "[e]ach lot or parcel must be a minimum of five (5) acres," *id.* § 16.08.04(A), and must meet strict requirements regarding things like maximum density, lot width, lot frontage, setbacks, and building height, *see id.* §§ 16.08.04(A), 16.08.05, 16.08.06, 16.08.08, 16.08.09. While certain uses are permitted inside the zone without a conditional use permit (CUP), *see id.* § 16.08.02, other uses are allowed only with such a permit, *see id.* § 16.08.03. And uses not listed as "permitted" or "conditional" are not allowed. *See id.* § 16.08.02 (stating that the uses "listed herein, *and no others*, are permitted" inside the RA-1 zone (emphasis added)).

¶6     One use that is conditionally allowed within the RA-1 zone is a "[r]esidential facility for handicapped persons." *Id.* § 16.08.03. Elsewhere in the WCC, requirements for "residential facilit[ies] for persons with disabilities" are set forth. *Id.* § 16.21.17(B). All parties to this appeal agree that the RA-1 zone's conditional-use reference (in section 16.08.03) to a "residential facility for handicapped persons" is intended to direct the reader to the requirements (in section 16.21.17(B)) applicable to a "residential facility for persons with disabilities."

¶7      In 2023, Cascade submitted an application for a CUP, seeking approval to operate Cascade House, within the RA-1 zone, as a residential facility for persons with disabilities. Members of Wasatch County's planning staff (county staff) prepared a report for the Planning Commission to consider in connection with Cascade's application. In that report, county staff noted that the intended residents of Cascade House were members of "a protected class" under both the federal Americans with Disabilities Act (the ADA) and the federal Fair Housing Act (the FHA). But county staff also noted that Cascade wasn't requesting "a reasonable accommodation" under the federal statutes, because such an accommodation wasn't "necessary since there is already a built-in accommodation within [the] WCC" in the form of the code's specific requirements for facilities for persons with disabilities. Thus, county staff framed the question not as whether the ADA or the FHA compelled a grant of Cascade's request but, instead, as whether the specific requirements of the WCC regarding facilities for persons with disabilities were met.

¶8      And on that point, county staff concluded that Cascade's proposal was "in compliance with [s]ection 16.21.17 of the [WCC] regarding persons with disabilities." With regard to the specific requirement that Cascade "[c]onform to all applicable standards and requirements of" the Utah Department of Health and Human Services (DHHS), county staff noted that Cascade House "will be required to have a license" from DHHS similar to the one that an affiliated facility would have. And with regard to the requirement that Cascade House "[b]e operated by or operated under contract with" DHHS, county staff acknowledged that "DHHS does not refer clients to Cascade [House] or pay for clients to be in Cascade [House]"; county staff reiterated that Cascade House "is licensed by DHHS, not contracted with [DHHS]."

¶9      The Planning Commission held a hearing on Cascade's application; at that hearing, public comment was taken and many

community members—including Appellants—spoke out against Cascade's application. As a result of the opposition, the Planning Commission tabled the matter and scheduled a second hearing to give Cascade time to consider and address "all the challenges and objections of concern" that community members had raised and to "give confidence to the Planning Commission and the community that [Cascade's application was] in compliance with" applicable zoning requirements.

¶10   At the second hearing, Cascade and county staff made presentations to the Planning Commission. First, a county staff member addressed each criterion that Cascade needed to meet for approval of its requested CUP. Next, an attorney from the Wasatch County Attorney's Office recommended that Cascade's "application be approved based on everything . . . presented." Lastly, a representative from Cascade advocated for the approval of Cascade's application, asserting that Cascade met the legal requirements and that "reasonable conditions [could] be imposed to mitigate any detrimental effect."

¶11   At the conclusion of the presentations, the Planning Commission approved Cascade's application, determining that it complied with both the specific requirements (found in section 16.21.17(B)) that the WCC imposes on residential facilities for persons with disabilities, as well as the general requirements (found in section 16.23.07) that the WCC imposes on all CUPs. The Planning Commission recognized that there had "been a large number of concerns regarding this application," but it ultimately determined to approve the application, subject to conditions.

¶12   Later, Appellants appealed the Planning Commission's decision to the Board. Among other things, they argued that the Planning Commission had erred in determining that Cascade House was a "residential" facility rather than a "treatment" facility. And they asserted that the Planning Commission had erred in concluding that Cascade House met all of the WCC's

requirements for approval of the application, including the specific requirements for facilities for persons with disabilities.

¶13   In response to Appellants' administrative appeal, county staff created a report summarizing the issues and providing a recommendation to the Board. In that report, county staff offered their view that Cascade's proposal met all relevant requirements in the WCC, including the specific requirements for facilities for persons with disabilities, and they recommended that the Board affirm the Planning Commission's decision. With regard to the contract-with-DHHS issue, county staff again noted—as they had in connection with the Planning Commission's hearing—that Cascade House was "licensed by" DHHS but "not contracted with" DHHS, and that DHHS "does not refer clients to Cascade [House] or pay for clients to be in Cascade [House]." But county staff nevertheless believed that this requirement was met because Cascade House was at least licensed by DHHS.

¶14   The Board held a public hearing to consider Appellants' appeal, and the interested parties made presentations to the Board. During their presentation, Appellants asserted that Cascade House was not a "residential" facility but was, instead, a "treatment" facility, a type of use not permitted in the RA-1 zone. Appellants also asserted that Cascade could not meet all of the specific requirements of the WCC, including the requirement that it be "operated by or operated under contract with" DHHS.

¶15   After discussion, the Board voted to uphold the Planning Commission's determination to approve Cascade's application and grant the requested CUP. In so doing, the Board made findings and conclusions supporting its decision. Among other things, it concluded that Cascade House would be "providing housing for a protected class as defined by the ADA and the FHA." Next, it found that Cascade was "in compliance with" the WCC's requirements for "'[r]esidential facilities for persons with disabilities,' in section 16.21.17(B)" of the WCC. In particular, it

stated that "[t]he residents of the residential facility will primarily be performing residential activities, while receiving treatment." Finally, the Board determined that Cascade was also in compliance with the general conditional use requirements found in section 16.23.07 of the WCC.

¶16     After that, Appellants filed a petition in district court seeking judicial review of the Board's decision. *See* Utah Code § 17-79-1009.[1] Appellants also filed a motion seeking summary disposition of their petition in their favor. Among other things, Appellants pointed out that, under the WCC, facilities for persons with disabilities may not be operated by private parties inside the RA-1 zone "without a contract with" DHHS. (Citing WCC § 16.21.17(B)(3).) From this premise, Appellants argued that Cascade House could not meet all of the relevant requirements and that therefore the Board's decision to approve Cascade's application was arbitrary, capricious, or illegal "because it [was] based on an incorrect interpretation of a land use regulation."

¶17     In response, Cascade filed a motion—joined by Wasatch County—asking the court to summarily affirm the Board's decision. In that motion, Cascade defended the Board's decision, asserting that its application had in fact met all of the WCC's relevant requirements; in particular, it asserted that "the license under which Cascade [House] will operate is a contract between Cascade" and DHHS.

¶18     After full briefing and oral argument, the district court granted Cascade's motion and dismissed Appellants' petition. The court concluded that there was "substantial, relevant

---

1. The parties cite section 17-27a-801 of the Utah Code, but that section has since been renumbered as section 17-79-1009. *See* Title 17 Recodification County Programs and Related Provisions, ch. 14, § 254, 2025 Utah Laws 1st Spec. Sess. We cite the renumbered version since no material changes have been made.

evidence . . . to support the Board's determinations" that Cascade House constituted a "[r]esidential [u]se" of Cascade's property and that Cascade met all of the relevant requirements of the WCC, including those for residential facilities for persons with disabilities. The court also concluded that the "FHA and ADA were appropriately applied" by the Board in considering Cascade's application.

¶19    With regard to the contract-with-DHHS issue, the court concluded that the WCC's requirement—that residential facilities for persons with disabilities located inside the RA-1 zone "[b]e operated by or operated under contract with" DHHS—was inconsistent with state licensing statutes, which contain no such requirement. And the court seemed to defer, at least to some degree, to Wasatch County's interpretation of the WCC, noting that Wasatch County was taking the position that having a license from DHHS satisfied the relevant WCC requirement, and further noting that Appellants were "asking the [c]ourt to disregard" Wasatch County's interpretation. Ultimately, the court concluded that Appellants' reading of the relevant WCC provision was "too narrow," and it accepted Cascade's assertion that DHHS licensure was sufficient to satisfy the requirement that Cascade House be "operated under contract with" DHHS.

ISSUES AND STANDARDS OF REVIEW

¶20    Appellants now appeal the district court's order dismissing their petition. They assert that the Board's decision was arbitrary, capricious, or illegal and that the court should not have dismissed their petition. In this procedural posture, when we are reviewing a district court's decision in an appeal from an administrative decision, "[w]e afford no deference to the intermediate court's decision and apply the statutorily defined standard to determine whether the court correctly determined whether the administrative decision was arbitrary, capricious, or illegal." *McElhaney v. City of Moab*, 2017 UT 65, ¶ 26, 423 P.3d 1284.

Under that standard, "[a] court shall presume that a final land use decision of a land use authority or an appeal authority is valid unless the land use decision is: (i) arbitrary and capricious; or (ii) illegal." Utah Code § 17-79-1009(3)(b). "A land use decision is arbitrary and capricious if the land use decision is not supported by substantial evidence in the record." *Id.* § 17-79-1009(3)(c)(i). And "[a] land use decision is illegal" if it is "based on an incorrect interpretation of a land use regulation," "conflicts with the authority granted by" state statutes governing counties, or is generally "contrary to law." *Id.* § 17-79-1009(3)(c)(ii). We review a county's (or municipality's) interpretation of its own ordinances for correctness. *See Outfront Media, LLC v. Salt Lake City Corp.*, 2017 UT 74, ¶ 12 & n.13, 416 P.3d 389.

## ANALYSIS

¶21    Utah's County Land Use Development and Management Act (CLUDMA) governs land use regulation by counties and empowers counties to "enact all ordinances, resolutions, and rules" "necessary or appropriate for the use and development of land" within the county. Utah Code § 17-79-101(b). CLUDMA authorizes counties to "adopt a land use ordinance that includes conditional uses and provisions for conditional uses that require compliance with objective standards set forth in an applicable ordinance," so long as no requirement in that ordinance "conflicts with a provision of [CLUDMA] or other state or federal law." *Id.* § 17-79-506(1).

¶22    In this instance, Wasatch County exercised its statutory authority to adopt a land use ordinance that controls the sorts of development that may occur in the RA-1 zone. As framed by county staff, the operative question is not whether federal statutes require Wasatch County to grant Cascade's application but, instead, whether Cascade's application satisfies the specific requirements of the WCC regarding residential facilities for persons with disabilities. We agree with this framing, and we

proceed to consider whether the district court correctly concluded that Cascade's application meets the relevant requirements. And because Cascade must meet *all* of the requirements, a failure on Cascade's part to meet any of the requirements will render its application infirm.

¶23   Those requirements include both factual and legal prerequisites. *See* WCC § 16.21.17(B). On the factual side, the WCC requires, for instance, that the proposed facility be "residential"[2] and that it be occupied around the clock in a supervised family-type arrangement. *See id.* § 16.21.17(B)(1). And it is also something of a factual inquiry, at root, to determine whether the proposed facility is "operated by or operated under contract" with DHHS. *See id.* § 16.21.17(B)(3). To the extent the Board made factual findings on these issues, we would disturb them only if we determined that they were arbitrary and capricious.

¶24   But the contract-with-DHHS issue, as presented here, is not a factual one, because the facts associated with this issue are entirely undisputed: all parties agree that Cascade is licensed by DHHS but that, aside from its license, Cascade has no contractual relationship with DHHS. Thus, the question the parties bring for our resolution is entirely legal and concerns the definition of the term "contract," as used in the WCC's requirement that Cascade

---

2. One of the arguments advanced by Appellants is that Cascade House is not a residential facility. They even assert that the Board failed to make a finding that Cascade House's primary use was residential. Although we need not reach this argument given our conclusion on the contract-with-DHHS issue, we note that the Board *did* make a clear finding that Cascade House's primary use was residential. Specifically, it found that the "residents of [Cascade House] will *primarily* be performing residential activities, while receiving treatment." (Emphasis added.)

"[b]e operated by or operated under *contract* with" DHHS.[3] *Id.* (emphasis added). Cascade posits that its possession of a license with DHHS satisfies this requirement. Appellants, on the other hand, contend that a license and a contract are entirely different legal concepts and that the WCC necessarily contemplates more than simple licensure in this context.[4]

¶25 Questions of ordinance interpretation present questions of illegality, because "[a] land use decision is illegal" if it is "based on an incorrect interpretation of a land use regulation." Utah Code § 17-79-1009(3)(c)(ii)(A). And as noted, we interpret county (or municipal) ordinances just as we do statutes: for correctness, with no deference provided to either the county's or the lower court's interpretation. *See, e.g.*, *Outfront Media, LLC v. Salt Lake City Corp.*, 2017 UT 74, ¶ 12 & n.13, 416 P.3d 389 ("We review the interpretation of ordinances for correctness.").

---

3. Although section 16.21.17(B)(3) requires that a residential facility for persons with disabilities "[b]e operated by" *or* "operated under contract" with DHHS, *see* WCC § 16.21.17(B)(3), no party contends that Cascade House is "operated by" DHHS. So we need only address whether Cascade House will be "operated under contract with" DHHS. *See id.*

4. At one point in its brief, Cascade asserts that Appellants failed to properly preserve the contract-with-DHHS issue for judicial review. But even Cascade acknowledges that this issue was raised "during Appellants' oral argument before the Board." And in this context, raising the issue at the Board level is sufficient to preserve it. *See A1 Pioneer Moving v. Labor Comm'n*, 2021 UT App 115, ¶ 12 n.6, 502 P.3d 305 (noting, in the administrative context, that where the Board had "fact-finding authority," a matter raised for the first time at the Board level—and not raised at the lower administrative law judge level—was sufficiently preserved for judicial review).

¶26    When considering a question of statutory, rule, or ordinance interpretation, we must keep in mind that "our primary goal is to evince the true intent and purpose of" the drafters of the provision in question. *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (cleaned up). And the best evidence of that intent is the language the drafters used to express that intent. *See Hertzske v. Snyder*, 2017 UT 4, ¶ 10, 390 P.3d 307 ("The best indicator of legislative intent is the plain language of the statutes themselves."). So we first look "to the plain language" of the provision, "presuming that the [drafters] used each word advisedly, and when we can ascertain the intent of the [drafters] from the statutory terms alone, no other interpretive tools are needed, and our task . . . is typically at an end." *Dole v. Dole*, 2018 UT App 195, ¶ 15, 437 P.3d 464 (cleaned up). However, we must not view the provision at issue in isolation; instead, the inquiry "requires that each part or section be construed in connection with every other part or section so as to produce a harmonious whole." *State v. Hatfield*, 2020 UT 1, ¶ 16, 462 P.3d 330 (cleaned up). Thus, "we give effect to every word of a statute [or ordinance], avoiding any interpretation which renders parts or words in a statute [or ordinance] inoperative or superfluous." *Bountiful City v. Baize*, 2021 UT 9, ¶ 42, 487 P.3d 71 (cleaned up).

¶27    The plain language of section 16.21.17(B)(3) requires that residential facilities for persons with disabilities operating within the RA-1 zone "[b]e operated . . . under contract with" DHHS. And in our view, the drafters' choice to use the word "contract"—rather than the word "license"—is meaningful here. After all, "contract" and "license" are legal terms of art that have materially different meanings. Definitionally, a license is a "privilege granted by a state or city upon the payment of a fee, the recipient of the privilege then being authorized to do some act or series of acts that would otherwise be impermissible." *License*, Black's Law Dictionary (12th ed. 2024). A contract, by contrast, is defined as an "agreement between two or more parties creating obligations that

are enforceable or otherwise recognizable at law." *Contract*, Black's Law Dictionary (12th ed. 2024).

¶28 Legally, these two concepts "are distinct." *See Slora v. Sun 'n Fun Fly-In, Inc.*, 173 So. 3d 1099, 1103 (Fla. Dist. Ct. App. 2015). A license is "issued by government agencies to allow the . . . license holder to engage in activity that would otherwise be prohibited or restricted by law or regulation." *Id.* A contract, by contrast, is a "bargained-for agreement[] created through a manifestation of mutual assent, typically through offer and acceptance, supported by the exchange of consideration." *Id.* A license "facilitates the government's regulation of an activity in the public interest, while a contract facilitates an exchange of promises between two or more parties for some mutually beneficial purpose." *Id.* Indeed, a license "does not have the elements of a contract," because it is "generally enforced through regulatory or criminal action," while "a contract is generally enforced through a suit for damages or specific performance." *Id.*; *see also WMS Gaming, Inc. v. Sullivan*, 6 A.3d 1104, 1111 (R.I. 2010) (stating that a license "is a mere privilege or permission and in no sense a contract or property" (cleaned up)); *US Ecology, Inc. v. State*, 111 Cal. Rptr. 2d 689, 702 (Ct. App. 2001) ("A license merely permits an entity to pursue a regulated activity, and has none of the elements of a contract." (cleaned up)); 53 C.J.S. *Licenses* § 3 (2026) ("A license is not a contract or obligation between the authority—federal, state, or municipal—granting it and the person to whom it is granted.").

¶29 Indeed, we have held that "a license does not create any vested rights in its holder because *a license is not a contract*." *Bourgeous v. Department of Com.*, 2002 UT App 5, ¶ 14, 41 P.3d 461 (emphasis added). And we have stated that a license is not the same as a contract because—unlike a party to a contractual relationship—the licensing entity retains "free latitude . . . to impose new or additional burdens on the licensee, or to alter the

license, or to revoke or annul it." *Id.* (cleaned up); *accord Riggins v. District Court*, 51 P.2d 645, 658 (Utah 1935).

¶30 Moreover, in addition to these contrasting dictionary definitions and compelling legal authorities, the structure of the relevant WCC provisions also weighs strongly in favor of a conclusion that the term "contract" should not be construed as coextensive with the term "license." First, an entire subsection of WCC section 16.21.17(B) would be rendered superfluous if we interpreted "contract" to mean "license," because subsection (2)—which requires Cascade House to "[c]onform to all applicable standards and requirements of" DHHS—already encompasses any licensure requirement. *See* WCC § 16.21.17(B)(2). In other words, subsection (2) already requires Cascade House to have a license, and if we read subsection (3) to require nothing more than that, the subsections would be duplicative. Such an interpretation would not "give effect to every word" in the ordinance. *See Baize*, 2021 UT 9, ¶ 42 (cleaned up).

¶31 Second, this interpretation also seems to run counter to the drafters' overall intentions for the RA-1 zone. As noted already, Wasatch County's stated intent was to "allow[] residential development near the incorporated areas, while maintaining the rural atmosphere of Wasatch County." WCC § 16.08.01(A). Similarly, although the RA-1 zone was "a means of facilitating a transitional development area," the drafters wanted "to maintain, as much as possible, the rural character of the [c]ounty." *Id.* As applied to residential facilities for elderly persons and persons with disabilities within the RA-1 zone, Wasatch County has adopted something of an anti-business stance: residential facilities for elderly persons "may not operate as a business" at all, *see id.* § 16.21.17(A), and similar facilities for persons with disabilities may only operate as businesses if they are "operated by or operated under contract with" DHHS, *see id.* § 16.21.17(B). Interpreting "contract," as used in subsection (3), to mean something more than a mere license is in keeping with what we

perceive to be the overall structure and purpose of the relevant section of the WCC.

¶32 For all of these reasons, we conclude that Cascade's licensure with DHHS is not the equivalent of Cascade House being "operated under contract" with DHHS, *see id.* § 16.21.17(B)(3), and on that basis we conclude that Cascade has not met all of the necessary prerequisites set forth in the WCC for a CUP for a residential facility for persons with disabilities.

¶33 Cascade resists this conclusion in three ways. First, it claims that, as a factual matter, DHHS does not actually enter into the sort of contracts that subsection (3) contemplates—contracts by which DHHS will refer patients to a facility or pay for patients to be housed in a facility—and from this premise, it asserts that the term "contract" must therefore be construed to include mere licenses. But no party presented any evidence on this issue to the Planning Commission, the Board, or the district court. Thus, there is no evidence in the record to support Cascade's contention that DHHS does not currently enter into such contracts with residential facilities for persons with disabilities. Indeed, when preparing their reports for the Planning Commission and the Board, county staff didn't seem to be under the impression that such contracts weren't an option, noting in that report, without comment about the availability of such contracts, that "DHHS does not refer clients to Cascade [House] or pay for clients to be in Cascade [House]."

¶34 Moreover, the WCC provision in question—the one that requires residential facilities for persons with disabilities to "[b]e operated by or operated under contract with" DHHS—was enacted in 2002 and was last amended in 2006. *See id.* Thus, to the extent it matters to our interpretive analysis—in which we are trying to ascertain the intent of the drafters of the relevant provision—whether DHHS actually does offer such contracts, the relevant date for such an inquiry would be 2002 or 2006, not 2026.

And no party provided any information to any decisionmaker at any point in this process about whether DHHS offered such contracts in 2002 or 2006.

¶35 In the end, the word "contract" must be given its plain meaning, regardless of whether DHHS does or does not currently offer the sort of contracts described in subsection (3). Cascade's remedy, if it believes the unavailability of such contracts is a problem, is to advocate for Wasatch County to amend its code to account for the realities Cascade believes to exist.

¶36 Second, Cascade contends that interpreting subsection (3) to impose an additional requirement beyond mere licensure "conflicts with Utah law," which Cascade contends "expressly permit[s] operation only through licensure." The district court found this argument persuasive. Both Cascade and the district court refer to several state statutes, all of which indicate that facilities similar to Cascade House must have a license from DHHS to operate. *See, e.g.,* Utah Code § 26B-2-105(1) (stating that a business "may not establish, conduct, or maintain a human services program in this state without a valid and current license" from DHHS); *id.* § 26B-2-206(1)(a) (stating that "[a] person . . . may not establish, conduct, or maintain a health care facility in this state without receiving a license from" DHHS); *id.* § 17E-7-201(2) ("The responsibility to license local programs or entities that operate a residential facility for persons with a disability . . . shall rest with [DHHS] . . . .").[5] But while these statutes all require

---

5. In supplemental briefing submitted after oral argument, Cascade cites additional provisions of Utah law that, in its view, support its assertion that "Utah law specifically permits facilities like Cascade House to operate through a license." *See, e.g.,* Utah Code §§ 26B-2-103, -104, -117; Utah Admin. Code R501-19-1. These additional sections likewise simply require that facilities like Cascade House have a license in order to operate, and they

(continued…)

facilities like Cascade House to have a license in order to operate, none of them has anything to say about whether counties or municipalities are (or are not) allowed to impose *additional* requirements upon such facilities in order for them to operate within particular zones. And as a matter of simple logic, the imposition of such additional requirements is not necessarily inconsistent with the state statutory licensure requirement, at least as long as the relevant ordinances do not attempt to countermand the licensure requirement (which the WCC does not, *see* WCC § 16.21.17(B)(2) (stating that residential facilities for persons with disabilities shall "[c]onform to all applicable standards and requirements" of DHHS)). Indeed, a "municipal ordinance need not be identical to the controlling state statute to be consistent with it." *Richfield City v. Walker*, 790 P.2d 87, 90 (Utah Ct. App. 1990); *see also Salt Lake City v. Newman*, 2006 UT 69, ¶ 10, 148 P.3d 931 ("We cannot simply assume that, by its silence, the legislature intended to permit conduct made punishable under an ordinance." (cleaned up)); *Layton City v. Glines*, 616 P.2d 588, 589 (Utah 1980) ("Although the scope of the municipal ordinance is more limited than the state statute, the provisions common to both are consistent and lawfully enforceable by the municipality."). Here, section 16.21.17(B) of the WCC is certainly not identical to state statutes that require only DHHS licensure, but it nonetheless remains consistent with those statutes because it does not "forbid[] that which the statute permits." *Salt Lake City v. Newman*, 2005 UT App 191, ¶ 11, 113 P.3d 1007 (cleaned up), *aff'd*, 2006 UT 69, 148 P.3d 931. The section simply requires both licensure *and* a contractual relationship with DHHS. Accordingly, Wasatch County's decision to impose additional requirements,

---

likewise do not prohibit municipalities from imposing additional requirements on such facilities in particular zones. Thus, while these additional citations do address DHHS licensing, they do not address DHHS contracts and thus do not affect our analysis in any meaningful way.

beyond those imposed by statute, for certain facilities to be able to operate within the RA-1 zone is not inconsistent with state law.

¶37　Finally, Cascade invokes the ADA and the FHA—federal statutes that prohibit discrimination, in housing matters and in other contexts—against various groups of individuals, including persons with disabilities. Cascade asserts—correctly, as far as we are aware—that the potential residents of Cascade House would be considered protected parties under these federal statutes. But Cascade's additional arguments on this point are somewhat diffuse; it appears to assert, without much in the way of specifics, that "the denial of its CUP . . . would have been discriminatory" and "in violation of federal law."

¶38　That may or may not be the case. But that question isn't before us in this appeal. No party has asserted a cause of action under the ADA or the FHA, and no party has identified a particular provision of either of those federal statutes that could conceivably bar Wasatch County from denying Cascade's CUP application if the requirements of the WCC are not met. And Cascade acknowledges—in at least two points in its appellate brief—that "this is not an accommodation case" under the federal statutes and that it at no point asked Wasatch County to make a reasonable accommodation for Cascade House. County staff understood this from the outset of the case, noting in their initial report that Cascade wasn't requesting "a reasonable accommodation" under the federal statutes because such an accommodation wasn't "necessary since there is already a built-in accommodation within [the] WCC" in the form of the WCC's specific requirements for facilities for persons with disabilities. Thus, county staff framed the question not as whether the ADA or the FHA compelled a grant of Cascade's request but, instead, as whether the specific requirements of the WCC regarding facilities for persons with disabilities were met. Following county staff's lead, the parties presented their case to the Board and to the district court in the same way.

¶39 The question presented below and on appeal is simply whether Cascade's CUP application meets the requirements of the WCC. For the reasons already set forth, it does not. And there our inquiry must end. If Cascade believes that a denial of its CUP application—on the ground that it can't meet the requirements of subsection (3) because it doesn't have a contract with DHHS—somehow violates the ADA or the FHA, it may attempt to present and litigate that question later. We offer no opinion on whether such an attempt would be procedurally or substantively proper.

## CONCLUSION

¶40 To qualify for a CUP, Cascade needed to meet all of the WCC's requirements for the RA-1 zone. Cascade cannot meet one of those requirements: the one in subsection (3) that requires all residential facilities for persons with disabilities located within that zone to "[b]e operated by or operated under contract with" DHHS. While Cascade has a valid license with DHHS that would allow Cascade House to operate, it does not have any other contractual relationship with DHHS, and Cascade House would therefore not "operate[] under contract with" DHHS. Thus, the Board's and the district court's interpretation of subsection (3)—that a license satisfied the contract-with-DHHS requirement—was incorrect, rendering the Board's land use decision illegal.

¶41 On that basis, we reverse the district court's order granting Cascade's motion and dismissing Appellants' petition, and we remand this case to the district court with instructions to grant Appellants' petition and to send this matter back to the Board for issuance of an order denying Cascade's CUP application.

───────────